**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| **United States of America,** | Civil No. 06-647 (JNE/SRN) |
| **Petitioner,** | |
| v. | **REPORT AND RECOMMENDATION** |
| **Perry Moseley,** | |
| **Respondent.** | |

Mary L. Trippler, Esq., on behalf of Petitioner

Lyonel Norris, Esq., on behalf of Respondent

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-captioned matter comes before the undersigned United States Magistrate Judge on the United States' Petition to Determine the Present Mental Condition of an Imprisoned Person Under 18 U.S.C. § 4245 (Doc. No. 1). This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636 and Local Rule 72.1. A hearing on this matter was held on April 28, 2006, wherein Daniel Carlson, Psy.D., Respondent's evaluating psychologist, testified. Respondent also attended the hearing but did not testify. For the reasons set forth below, the testimony and exhibits presented at the hearing on this matter, and all the other records herein, this Court recommends that the United States' petition be granted.

**I.   BACKGROUND**

Respondent was born and raised in Chicago. (Doc. No. 4 at 1, Gov't Ex. B, Respondent's Psychiatric Evaluation Dated Jan. 26, 2006.) When he was seventeen, Respondent suffered multiple facial fractures and a significant head injury from a

serious motor vehicle crash.  (Id.)  Respondent reports that he graduated high school and attended college for two years, obtaining an associate degree in Business Management.  (Id.)  Respondent became noticeably paranoid at the age of twenty-six.  (Id. at 2.)  There is no evidence, however, that he was ever evaluated by a mental health professional prior to entering federal custody.  (Id.)  Respondent's twin brother has received inpatient psychiatric treatment for mental illness.  (Id. at 1.)

Respondent had no significant criminal record prior to his February 27, 2003 arrest at age thirty-seven in Chicago, Illinois on a bank robbery charge, a charge to which he ultimately pleaded guilty and for which he was sentenced to forty-eight months imprisonment.  See United States v. Moseley, Crim. No. 03-212 (N.D. Ill. Crim. Compl. filed Feb. 28, 2003.)  Respondent is not married, has no children, and prior to his prison confinement he was living with his mother in Chicago.  (Doc. No. 4 at 1, Gov't Ex. B, Respondent's Psychiatric Evaluation Dated Jan. 26, 2006.)  He reports having had more than ten jobs, the longest period of employment being approximately three years; Respondent was not employed at the time of his arrest.  (Id.)

After his arrest for bank robbery, Respondent was detained at the Metropolitan Correctional Center in Chicago (MCC-Chicago) and, in April and May of 2003, underwent a psychiatric evaluation to determine his competence to stand trial.  (Id. at 2.)  The MCC-Chicago evaluator diagnosed Respondent with Schizotypal Personality Disorder, and Rule Out Schizophrenia but determined that he was competent to stand trial.  (Id.)  In September 2003, while at MCC-Chicago, Respondent was placed on suicide watch after writing a note saying he would commit suicide if he was not removed from his cell because he had a conflict with his cellmate.  (Id. at 2.)

A second competency evaluation was requested in February 2004 after Respondent indicated that he wanted to remain in jail pending trial to avoid the government harassment he experienced when not incarcerated. (Id.) Thus, in March 2004, Respondent was reevaluated at the Isaac Ray Forensic Group and was diagnosed with Delusional Disorder, Mixed Type (Persecutory and Grandiose), and Cognitive Disorder Not Otherwise Specified and determined not to be competent to stand trial due to his delusional beliefs. (Id. at 2-3.)

In September 2004, Respondent was again evaluated, this time at the Federal Correctional Institute in Waseca, Minnesota (FCI-Waseca). (Id. at 3.) While at FCI-Waseca, Respondent reported, "due to visible symptoms from apparent chemicals or illegal substance that the federal system has allegedly implanted within my food, I request that you do not attempt to feed me at this time and until further notice." (Id.) In late November 2004, Respondent stated that he believed his "case study may be an unofficial death sentence." (Id.) He was diagnosed at FCI-Waseca with Delusional Disorder, Persecutory Type, and Cognitive Disorder Not Otherwise Specified and found not competent to stand trial. (Id.) On December 22, 2004, the trial court in the Northern District of Illinois, the Honorable District Court Judge Matthew F. Kennelly presiding, determined that Respondent was mentally incompetent to stand trial and ordered that Respondent be hospitalized for treatment pursuant to 18 U.S.C. § 4241(d)(1) for a period not to exceed four months. See United States v. Moseley, Crim. No. 03-212 (N.D. Ill. Order docketed December 22, 2004.) The trial court recommended that Respondent be sent to the Federal Medical Center in Rochester Minnesota (FMC-Rochester) for treatment. (Id.) Instead, the Bureau of Prisons sent Respondent to the

Federal Medical Center in Butner, North Carolina (FMC-Butner).  (Doc. No. 4 at 4, Gov't Ex. B, Respondent's Psychiatric Evaluation Dated Jan. 26, 2006.)

While at FMC-Butner, Respondent refused to take psychotropic medication but FMC-Butner staff determined that his involuntary medication was not necessary.  (Id.)  On April 21, 2005, however, Respondent became agitated and shouted at staff, alleging that he was being sexually harassed.  (Id.)  He became so agitated that FMC-Butner staff determined that Respondent was unable to function in the open unit because of a risk of harm to others and Respondent was moved to a single cell where he became calm.  (Id.)  Respondent also reported being the recipient of personalized messages on his radio.  (Id.)  The evaluator of Respondent's mental health at FMC-Butner diagnosed him with Delusional Disorder, Persecutory Type, and Cognitive Disorder Not Otherwise Specified but recommended that Respondent was competent to stand trial.  (Id.)

After Respondent returned to MCC-Chicago in June 2005 following his time at FMC-Butner, he immediately exhibited paranoia and consistently refused treatment.  (Id.)  He remained in locked housing due to his fearfulness and paranoia for the next several months.  (Id.)

In October 2005, Judge Kennelly determined that Respondent was competent to stand trial, Respondent entered a guilty plea, and Respondent was sentenced to forty-eight months confinement for bank robbery.  (Id.)  Judge Kennelly stated in his Judgment: "The Court strongly recommends, due to defendant's significant and longstanding psychiatric disorder, as documented by the reports of numerous experts accompanying the [Presentencing Report], that [Respondent] be designated to a medical facility where he may receive specialized, not general, psychiatric care and

treatment." (Doc. No. 1 Gov't Ex. A, Judgment.)  Respondent was delivered to FMC-Rochester on December 7, 2005.  (Id.)

Upon arrival at FMC-Rochester, Respondent reported being harassed by a number of people and organizations, and told evaluators that God told him to rob a bank "for [his] protection from persecution." (Doc. No. 4 at 5, Gov't Ex. B, Respondent's Psychiatric Evaluation Dated Jan. 26, 2006.)  At the motion hearing, Carlson testified that he believed Respondent meant that he robbed the bank so that he would be imprisoned and would be less oppressed from government forces.  At FMC-Rochester, Respondent denied experiencing hallucinations or having suicidal thoughts.  (Id.)  At the time of his admission, Respondent was not taking any psychiatric medications.  (Id.)

While initially placed in the open housing unit at FMC-Rochester where he had a cellmate, on December 9, 2005, Respondent approached the nurses station and stated, "I am going to hurt someone . . . . I was oppressed by the government for many years." (Id.)  Respondent also stated, "That guy in my room is upset at me for putting my coat on the chair.  I can't handle it." (Id.)  Staff then placed Respondent in the specialized housing unit, the most secure area of FMC-Rochester where inmates remain in cells alone for most of the day.  FMC-Rochester evaluators determined that Respondent would benefit from psychotropic medication, but he refused to consider medication and stated that he was not mentally ill and did not require treatment. (Id.)  When Respondent was later released to the open housing unit, he reported that "the government has had me under surveillance since 1997 . . . . those authorized by the government are harassing me." (Id.)  Respondent was then moved back to the specialized housing unit.

Since then, Respondent has refused to leave the specialized housing unit. (Id.) Respondent told staff that there is a person in the government authorized to make the phone ring when he has a sexual thought as part of an effort to harass him. (Id.) He also informed evaluators that when he receives a chocolate doughnut for breakfast it means that the black people are winning and if he receives a white doughnut it means the white people are winning. (Id. at 5-6.) After Respondent completed a portion of a personality assessment questionnaire, evaluators at FMC-Rochester concluded that the assessment showed Respondent had a paranoia score three standard deviations above average. (Id. at 6.) On January 24, 2006, Respondent submitted a note to a custody supervisor at FMC-Rochester which reads:

> Apparently, much like the schemes and plans of the "pervert"ed, undercover cellee upstairs, your investigation has proven to be uneffective. This second notice of the Federal National Intelligence on a one-time non-conspiracy bank robbery is just "lu[d]icrous." I don't appreciate being woke up in the middle of the night during that good "dream sleep" because a hallway phone rings that no one bothered to answer. The Federal System continues to break its own laws by also ringing that same phone based on my own personal thinking and revealing information to other inmates who are against someone they don't even know. Termination seems appropriate under these circumstances.

(Id.) Carlson testified at the motion hearing that Respondent has exhibited significant non-bizarre delusions such as believing inmates, prison guards, and his attorney wanted to have sex with him and/or actively sexually harassed him.

Carlson and Ubaldo Bocanegra, M.D., staff psychiatrist at FMC-Rochester, concluded in a February 7, 2006 report that Respondent's diagnosis is Delusional Disorder, Persecutory Type Cognitive Disorder, Not Otherwise Specified. (Id. at 7-8.) They report that Respondent also has difficulties with attention, vigilance, and memory,

6

which are likely the result of the brain injury Respondent suffered in his motor vehicle crash. (Id. at 7.) At the motion hearing, Carlson stated that Respondent did not possess insight into his mental health problems which hinders his treatment. Carlson and Bocanegra report that Respondent's prognosis for showing pronounced improvement is good if he receives appropriate treatment, including psychiatric medications, psychotherapy, active therapy, and psychoeducational rehabilitation. (Id. at 8.) While Carlson conceded at the motion hearing that some or all of Respondent's mental illness may stem from the traumatic brain injury Respondent suffered at the age of seventeen, Carlson testified that the treatment regimen for a person with Respondent's diagnosis would be the same no matter the source of the mental illness. At the motion hearing, Carlson stated that such treatment is not available in the general prison population.

On cross examination, Carlson further conceded that there was no evidence that Respondent had physically hurt anyone or made any particularized threats against others and stated that Respondent's condition had not become noticeably worse while at FMC-Rochester. Carlson also testified that it was possible that Respondent could go on living in his present state indefinitely. Carlson testified, however, that Respondent could get worse, could become suicidal, and his delusions would likely become more entrenched based upon his experience with other inmates in similar circumstances. In their report to the Court, Carlson and Bocanegra state, "it is likely [Respondent's] delusions would become more entrenched and difficult to treat. He has expressed suicidal ideation in the past and this could reemerge as a problem." (Id. at 7.)

Carlson and Bocanegra conclude that Respondent requires inpatient

hospitalization in a mental health unit in an FMC and recommend that he be committed pursuant to 18 U.S.C. § 4245(d).  (Id.)  Carlson stated at the motion hearing that the goal would be to return Respondent to the open population, to get him to participate in various recreational, social, and work activities, and for him to actively engage in planning for his life after his release from prison.

## II.     DISCUSSION

Under 18 U.S.C. § 4245, a prisoner who is serving a sentence in federal prison "may not be transferred to a mental hospital without the prisoner's consent or a court order."  United States v. Watson, 893 F.2d 970, 975 (8th Cir. 1990), vacated in part on other grounds by United States v. Holmes, 900 F.2d 1322 (8th Cir. 1990).  If the prisoner objects, the government may petition for a hearing on the present mental condition of the prisoner to determine "if there is reasonable cause to believe that the person may presently be suffering from a mental disease or defect for treatment of which he is in need of custody for care or treatment in a suitable facility."  18 U.S.C. § 4245(a).  "If, after the hearing, the court finds by a preponderance of the evidence that the person is presently suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility, the court shall commit the person to the custody of the Attorney General."  Id. at § 4245(d).

Accordingly, this Court is required to determine the following: (1) whether Respondent is suffering from a mental disease or defect; (2) if so, whether Respondent is in need of care or treatment for that disease or defect; and (3) if so, whether FMC Rochester is a suitable facility.  For the reasons set forth below, the Court finds Respondent is in need of custody for care or treatment of a mental disease and/or

defect.

A. **Respondent is Suffering from a Mental Disease or Defect**

The Court finds that there is ample evidence that Respondent is suffering from a mental disease or defect. Respondent was diagnosed with schizotypal personality disorder in 2003 by MCC-Chicago. Since then, Respondent has been diagnosed with a delusional disorder four times in four different evaluations by four different facilities. The record demonstrates that Respondent harbors significant non-bizarre delusions such as believing that inmates, prison guards, and his attorney want to have sex with him and/or sexually harass him which go beyond the normal realm of vigilance and some bizarre delusions like believing the phone rings because government agents can read his thoughts. Respondent also appears to have ideas of reference such as believing that common things such as doughnuts have meanings concerning whether Caucasians or blacks are winning some kind of conflict.

Given the record now before it, this Court finds the opinion of Carlson and Bocanegra to be credible and persuasive, and that their opinion demonstrates, by a preponderance of the evidence, that Respondent is suffering from a mental disease or defect.

B. **Respondent is in Need of Custody for Care and Treatment**

The standard for when a prisoner is "in need of custody for care or treatment" under 18 U.S.C. § 4245(d) has not been firmly established. One district court has explained that there is a continuum of "need" between treatment that is merely beneficial and treatment that is necessary to combat dangerous behavior. United

States v. Horne, 955 F. Supp. 1141, 1146-47 (D. Minn. 1997). It is clear, however, that "if a prisoner whose mental illness was left untreated would pose a danger to himself or others if placed in the general prison population, . . . treatment is needed within the meaning of 18 U.S.C. § 4245." Id. at 1149, cited by United States v. Eckerson, 299 F.3d 913, 914 (8th Cir. 2002).

The Court finds that Respondent is both a danger to himself and to others in the general prison population. First, Respondent has previously exhibited suicidal ideation and his lack of insight into his mental illness presents a risk that these thoughts will reemerge, especially given Carlson and Bocanegra's finding that "it is likely his delusions of oppression would become more entrenched and difficult to treat" if left untreated. (Doc. No. 4 at 7, Gov't Ex. B, Respondent's Psychiatric Evaluation Dated Jan. 26, 2006.) Second, as recent as December 9, 2005, Respondent expressed that he "was going to hurt someone" in the context of a conflict with his cellmate. The Court finds that, given the circumstances, such a statement is more than a mere generalized threat but one arising from agitation with a particular individual, Respondent's cellmate. Thus, the Court finds that Respondent also poses a danger to others if placed in the general prison population.

A preponderance of the evidence demonstrates that Respondent's mental disease or defect poses a danger to himself or others because it has caused him to have suicidal thoughts and make threatening statements concerning others. Therefore, Respondent is in need of treatment for more than just his own benefit.

**C.    FMC-Rochester is a Suitable Facility**

Respondent appears to concede that FMC-Rochester is a suitable facility for

care or treatment, and this Court finds entirely persuasive the evidence presented that FMC-Rochester is a suitable facility.  Staff at FMC-Rochester are familiar with his mental illness and have a plan for treating that illness through a multidisciplinary approach.

Based upon the foregoing and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED THAT**:

1. The United States' Petition to Determine Present Mental Condition of an Imprisoned Person Under 18 U.S.C. § 4245 (Doc. No. 1) be **GRANTED**;

2. Respondent should be committed to the custody of the Attorney General of the United States pursuant to 18 U.S.C. § 4245 for hospitalization and treatment until the Respondent is no longer in need of such custody for care and treatment, or until the expiration of the sentence of imprisonment, whichever occurs earlier.

Dated:   May 5, 2006

s/ Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge

Under District of Minnesota Local Rule 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by May 22, 2006, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  All briefs filed under this rule shall be limited to ten pages.  A judge shall make a de novo determination of those portions to which objection is made.